51

liability or prove lack of content -- not every testifying defendant who is convicted qualifies for a Section 3C1.1 enhancement."

That's our point, Your Honor, that there is some basis that supports what Mr. Montgomery was testifying to. There was evidence that supports what he was saying. It's our position that he did not perjure himself on the stand, Your Honor. Thank you.

THE COURT: Thank you. The court is ready to rule on the motion to delete the enhancement for adjustment, for obstruction adjustment. That motion is denied. I do find that there was a preponderance of the evidence that the defendant lied to the FBI, that the material that he lied about was material information that obstructed justice and the two points for each group should and properly be there. Any other matters, Mr. Berline?

MR. BERLINE: Your Honor, this is the part where I've pretty much already covered. But because I misunderstood the court, we didn't, we missed the entire sentencing guideline. So what I'd like to do is, my final point is Mr. Montgomery's age. We are at, we have not convinced the court to change the PSR, so we are at the offense level of 38, and that gives a 235, 235 months to 293.

Under *Koon v. U.S.*, Your Honor, the court can look at the totality of the circumstances and deviate from the guidelines if, as long as the Sentencing Commission has not proscribed any of those

1575

Q    Did you enter Tom Aldan's office that day?

A    No, we did not.

Q    Now I'd like to direct your attention to the next day. What, if anything, did you do with respect to Doug Montgomery?

A    On March 8th, we telephoned Mr. Montgomery and asked him if he would meet with us to discuss the allegations that had been brought forward.

Q    And who was on the phone with Mr. Montgomery?

A    I personally talked with Mr. Montgomery.

Q    And when you had Mr. Montgomery on the phone and asked for a meeting, what did he say?

A    He agreed to come over to the offices of the FBI, which are located at Marina Heights over in Puerto Rico area, lower Navy Hill.

Q    Over by Bank of Hawaii?

A    That's correct.

Q    And did Mr. Montgomery come to attend the meeting?

A    Yes, he did.

Q    And just tell us what happened at the outset of the meeting, who was present?

A    Initially, Special Agent Rich Wallace of the FBI, myself, and IRS Agent Tai Lee were there.

Q    And was Mr. Montgomery there?

1576

A   Yes, he was.

Q   And at some point, did anyone else join the meeting?

A   Yes, after talking with Mr. Montgomery and advising him that it was voluntary, and that he was free to leave, and consult an attorney and whatever he wanted to do, two prosecutors with the United States Attorney's Office here in Saipan attended the meeting.

Q   In the course of the meeting, was Mr. Montgomery asked how he found out about the Bank of Saipan?

A   Yes, he was.

Q   And what did he tell you and the others about that?

A   He said that an individual by the name, or individuals by the name of Jim Nava and Robert Skivery (sic) introduced him to people at the Bank of Saipan.

Q   Was that Skivery, or was it --

A   Skirvy (sic) or Skivery.

Q   Okay, just say it again, what name?

A   Okay, I'm sorry.  James Nava and Robert Skivery, excuse me.

Q   Can you spell it?

A   I think it's S-k-i-v-e-r-y.

Q   Is there something I can show you that will help you refresh your recollection?

A   Yes, please.

MR. SMITH: I'm going to give the witness a copy of 3520E.

THE COURT: You may.

Q  BY MR. SMITH: Just take a look at 3520E and tell us if that refreshes your recollection on the name of, what you're trying to spell for us, and who, what the fellow's name was.

A  Yes. Yes, it's S-k-i-r-v-i-n-g, Skirving.

Q  Skirving?

A  Skirving.

Q  Was Mr. Montgomery asked, in this meeting at the FBI on March 8, 2002, about his banking experience?

A  Yes, he was.

Q  And what, if anything, did Mr. Montgomery tell you about his banking experience?

A  Amongst the papers or documents we had been given were a package that had been given to the Banking Commission here in the CNMI as an application for Mr. Montgomery to become an owner of the Bank. And in that documentation was a list, an affidavit prepared by him or submitted on his part, that gave his banking experience. And from 1990 through 1997, I was working in Texas on the Savings and Loans failures, so of interest in there was a fact that he had been involved with Texas banks in, during or about that time period. It appeared if that were true, it'll be very easy to validate his

experience in the banks because there's a book called a "Texas Red Book" in banking. And each bank and its branches, its directors, its presidents, and all the officers of the bank are listed in this Red Book. If that information, if I could obtain the banks and the dates, I could call somebody in Texas and they pretty quickly could tell me, you know, the bank and whether or not he had been there.

MR. SMITH: Your Honor, if we could display Government's Exhibit 28B, which is in evidence, to the jury?

THE COURT: You may.

MR. SMITH: And if we could have that switched over, and if we could move forward to the page that says "Affidavit." Scroll forward. Okay.

Q   Do you have it up there on the screen, Agent Hewitt?

A   Yes, I believe, I -- yes, I have an affidavit of B. Douglas Montgomery.

Q   Did you have a copy of this affidavit with you on March 8, 2002?

A   Yes, I did.

Q   And would you explain to the jury, please, what you did in terms of reviewing this affidavit with Mr. Montgomery during your interview?

A   If you'll look, in particular, there's two items in the, where

it says, "To wit," then it has what is a No. 1.  It says, "Prior Banking Experience."  And it states: "I was privy to serve as a director of a Texas bank for a period of three years."

If that's true and if he could identify the bank and the years he served, we would make a telephone call to Texas and say, "is this guy, director of the bank? can you look it up in the Red Book? can you contact the bank?"  We have a contact at the bank that can verify that information.

So I asked him specifically, "Which Texas bank and what years were you there?"  And through the course of the conversation, he advised me he had not been the director of a bank in Texas, so he would not be a director of a bank and the period of three years would have been irrelevant time because he would have never been one.  It also goes on to explain that would be valuable or it would be a great deal of experience and it inspires his confidence.

And then we went down to the next --

MR. SMITH: Well, if we could just blow that back up again?

Q    Did you ask him about this next statement where it says, "In addition," --

A    Yes, sir.

Q    -- "I was one of five bank directors and shareholders who created a new Texas bank so I gained valuable experience and the

1580

challenges of banking at the start of level." Did you ask Mr. Montgomery about that?

A    Yes, this was a particular interest because when you take a bank and you start it from nothing and you get it into a full fledged bank, you have to know all the regulations.  Everything that's going on, who owns it, you know, your employee issues, banking policies, banking procedures, employment agreements, who's accountable for what, what are the liabilities of the bank, what are the loan to one ratios, how do you establish that, all the compliance issues you would be familiar with.  So this was a particular interest because with a brand new bank, particularly, in Texas because the banking in Texas had come under such scrutiny after the SNL failures, that the people who survived that had a great deal of expertise and how to run a bank.

And, again, I asked him what's the bank, you know, who's the owner, and some information.  And what essentially came out of it was that he had not been the director of a new bank in Texas, but he knew a president of a bank, of a new bank in Texas.

Q    What, if anything, was Mr. Montgomery asked about whether he understood that this affidavit was being submitted to the CNMI Banking Commissioner, Director of Banking, in connection with the approval to acquire ownership of the Bank?

1581

A   There's a second page to this document, in which it bears the signature.

MR. SMITH: Just scroll forward to get the signature page, please.

THE WITNESS: Yeah, I'm sorry. It may not be the next page, but the final page of this document bears a signature that says, "Respectfully submitted, B. Douglas Montgomery." And in light of the answers that he had not been a director of a bank, and he had not been a director of a brand new bank, I asked him, "Did you sign this document? This was submitted to the Banking Commission and to be used as consideration." And he said that that was not his signature, but he had read the document and he was aware it would be submitted to the Banking Commission.

Q   What, if anything, was he asked about whether or not he understood that it contained false information and would be sent to the Banking Commissioner?

A   When asking him in little more detail about it, he understood that the statements in there were misleading, that if you read it, it would, it would make you believe that he was coming in with a great deal of experience, that he knew how to operate a bank, that he's familiar with bank policies. And he admitted, that, yeah, it was misleading, it was not only inaccurate, it was misleading.

1582

Q   And just so we're clear, he told you that that is not his signature?

A   He advised us this is not his signature.

Q   What, if anything, was Mr. Montgomery asked about his status at the Bank as of March 8, 2002?

A   We asked Mr. Montgomery what his understanding was of his status at the Bank, and he said he was the Bank owner, he owned the Bank of Saipan.

Q   Well, what, if anything, did you ask him about who, as of March 8, 2002, was on the Board of Directors and whether the Board of Directors had changed in any way?

A   Mr. Montgomery indicated that he intended to put in or seat a new Board of Directors, but that the Board of Directors had not been changed as of that time.

Q   As of March 8, 2002?

A   As of March 8, 2002.

Q   Now were any questions put to Mr. Montgomery about the loan to Sweven Systems, 500,000 in November and then $4.5 million in January, 2002?

A   Yes, Mr. Montgomery was questioned about the Sweven's loan.

Q   And what, if anything, did Mr. Montgomery say in response to questions about whether the Sweven Systems loan or deal would be a

benefit to the Bank of Saipan?

A    Mr. Montgomery believed that this loan being extended to Sweven Systems would be a good thing for the Bank, and that they would receive 10% of the ownership of Sweven Systems, and that the Bank would be receiving money as a transactions to this credit card company that Sweven was associated with or represented to be. Each time, as a settlement bank, each time a credit card transaction would clear the Bank, the Bank would collect four cents. The Bank would retain two cents for its own use to reduce the debt on this $5 million loan. And then the other money, the other two cents would go to a company called Transglobal Equipment.

Q    What, if anything, was Mr. Montgomery asked about who owned Transglobal Equipment?

A    At that point in time, we had another document that had some information as to the ownership of Transglobal. And Mr. Montgomery admitted he owned, he was an owner, one of the owners of Transglobal Equipment.

       MR. SMITH: Well, can we scroll forward in 28B to the Transglobal Equipment page, please? And there we are. If we could blow up from "Officers down to Shareholders"?

Q    Now leaving aside your questioning of Mr. Montgomery for a moment, just putting that on hold. Can you just read for us who the

officers are of Transglobal from this document in evidence? Would you read that for us, Agent Hewitt?

A   Under Officers, it states that: "Ted Pool, attorney, Oklahoma City, Oklahoma; B. Douglas Montgomery, Blaine, WA;" or Washington, "David Murakami, in Honolulu Hawaii; and DuSean Berkich, Orange, California."

Q   And do you see where it says, "Shareholders"?

A   Yes, sir.

Q   What does it say there?

A   It says: "The above listed officers own the majority of shares."

Q   Now leaving that aside and returning to your interview of Mr. Montgomery, what, if anything, was said about -- withdrawn. Was anything said in the interview about something called "click charges"?

A   Right. Mr. Montgomery referred to these, each time a transaction clears the Bank, that it was called a "click charge," that that's, I guess, a term in the industry, in credit card industry for the times the transaction actually clears through the bank.

Q   And what, if anything, was said about the click charges and how they relate to the four cents and the two cents?

A   Right.  Each time a, the benefit to the Bank, again, is as a settlement Bank, the click charge or transaction would come through, and the Bank would collect four cents each time one of these transactions came through or each click, two cents going to the Bank to reduce the principal on the loan and pay the interest, and two cents going to the benefit of Transglobal.

Q   Was Mr. Montgomery asked anything about what the collateral was supposed to be for this $5 million loan to Sweven Systems by the Bank of Saipan?

A   Yes.  Mr. Montgomery stated that it was his understanding the owner of Sweven Systems, an individual known as Michael Wilson, was to secure, or to pledge a reserve account somewhere -- in the interview, he told us somewhere in the figure between ten to $40 million.  The part of that would be placed or collateralized the loan basically to ensure that it could be paid prior to the loan being finalized and disbursed to Mr. Wilson or to, excuse me, Sweven Systems.

Q   Did the Sweven Systems loan come up more than once in the interview?  In other words, did you inquire about it two different times in the interview?

A   Right.  Initially, we tried to go over it.  As a matter of fact, Mr. Montgomery stated that he felt he knew why we wanted to

talk to him and one of them in particular was this Sweven Systems' loan. And so we addressed that for a little bit. And then we went back and we tried to clarify some of the issues that were maybe still outstanding in our minds.

Q   Now in the earlier phase of the interview, was Mr. Montgomery asked about the existence of this reserve account at NDC or National Data Corporation in Atlanta?

A   Yes, he was.

Q   And what, if anything, did Mr. Montgomery say in response to questions about that?

A   Mr. Montgomery believed that this reserve account existed but that there had been problems getting the money transferred over to Bank of Saipan, which was important because this account far exceeded the debt or the loan that Mr. Wilson was asking for. And a reserve account is like a cash account. If the loan had problems, you would just go in and pull out cash versus having to sell some kind of a long-term assets. So the Bank would receive more than enough liquid funds or have access to them to settle this loan if it had any problems.

Q   Now was Mr. Montgomery asked about whether or not he had had any interaction or dealings with Michael Wilson in connection with the Sweven Systems' loan?

A   Mr. Montgomery said that he was aware of the loan that had been funded, but he had not had conversations with Mr. Wilson about the actual funding of the loan, the fact that it had taken place.

Q   Let me see if I get this. Mr. Montgomery told you that he had had no conversations with Michael Wilson about the Sweven Systems' loan?

A   That's correct.

Q   And that was on March 8, 2002?

A   That's correct.

Q   Well, did you ask him, ask Mr. Montgomery whether he had any role at all in putting this loan deal together?

    MR. PARSONS: Object. Leading.

    MR. SMITH: It just, it's just setting up the testimony, Judge. What, if anything, was he asked about --

    THE COURT: I'll sustain it. Why don't you ask it that way?

Q   BY MR. SMITH: Agent, Hewitt, in your interview of Mr. Montgomery on March 8, 2002, what, if anything, was he asked about his own role in the Sweven Systems' transaction?

A   Mr. Montgomery said he accepted full responsibility for the loan being funded. He said that he was aware of it being funded, and that he thought that it was a good thing for the Bank, but that