he was unaware or had no firsthand knowledge of the actual mechanics or the actions that were taking place as they took place to fund the loan.

Q    What, if anything, was Mr. Montgomery asked about a company called "United Forex Exchange" and his relationship with that company?

A    We went over, we had information that he was associated with a company called United Forex, and that he advised us that he had been introduced to United Forex by Jim Nava and Robert Skirving to Mike Bradley and Darren Smith, and that United Forex was a currency exchange company that -- excuse me.  It dealt with currency exchange and that Michael, Darren Smith and Michael Bradley were stock brokers, which was a little inconsistent.

Q    Is that what Mr. Montgomery told you about that?

A    No, he told us -- let me, let me back up.  The fact it was inconsistent was an assumption on my part, that it's a foreign currency exchange issue, but that there were stock brokers involved in it.

Q    Well, if we could, let's just stick to what Mr. Montgomery --

A    Okay.

Q    -- was saying. Well, what, if anything, did Mr. Montgomery tell you about where he got the money from to buy the Bank of Saipan

1589

stock?

A    He advised us that it was a loan from United Forex of 2.8 million.

Q    Now did you have the opportunity -- during the interview, did you and the others have the opportunity to put questions to Mr. Montgomery about a loan that he obtained for $260,000?

A    Yes, we did.

    MR. SMITH: May I have a moment, Your Honor?

    THE COURT: You may.

    MR. SMITH: Your Honor, if we could just display Government's Exhibit 27 for the jury, please?

    THE COURT: You may.

Q    BY MR. SMITH: Among the documents that you received from Ben Fitial on March 7th, did you have a financial statement for Doug Montgomery?

A    Yes, we did.

Q    And did you ask questions to Mr. Montgomery about the items on his financial statement?

A    Yes, we did.

    MR. SMITH: And if, while I'm posing questions to Agent Hewitt, if you could scroll for us forward to find the financial statement, please.

Q   Now in the package of materials that had come from the Department of Commerce, submission that we saw before, Government's Exhibit 28B, was there also a financial statement on that one?

A   Yes, there was.

Q   Okay. Which financial statement were you showing Doug Montgomery and discussing with Doug Montgomery during your interview on March 8th?

A   There was a financial statement that I believe will come up with this loan packet. We actually were looking at, looked at both of them, but the discussion took place over a financial statement which was part of a $260,000 loan that Mr. Montgomery had received. We went through, because it was the most recent one we had, we went through it and discussed it with him.

        MR. SMITH: Okay. And if we could get the two pages of the financial statement side by side up on the screen? Do everyone have that up on the screen now, the financial statement?

Q   And let me just hand you a copy of Government's Exhibit 27 in evidence, Agent Hewitt. Is this the financial statement you were reviewing with Doug Montgomery during the interview?

A   Yes. Yes, sir.

Q   All right. Take a look at the top of each statement. Do you see that the dates are different, Agent Hewitt? The one on the left

says February 1, 2002. And the one on the right says, February 1, 2001. See that?

A    Yes.

Q    What, if anything, was Mr. Montgomery asked about discrepancy in the dates on these two pages?

A    He advised that the date, February 1 of 2001 was a typographical error that actually it represented February 1, 2002.

Q    Was Mr. Montgomery asked who prepared this financial statement?

A    Yes, he was.

Q    And what did he say about that?

A    He said that he prepared that financial statement.

Q    Was Mr. Montgomery asked about whether he understood that the Bank would look at this financial statement before they made a loan to him?

A    Yes, he was.

Q    And what did he say about that?

A    He believed that financial statement was not a deciding factor on whether or not he would get the loan.

Q    Now do you see there's an item on the right-hand side under Accounts Receivable No. 2? It says, "Michael Wilson, $7 million.

A    Yes, uh-huh.

Q    What, if anything, was Mr. Montgomery asked about the nature

of this item and accounts receivable?

A   We went through accounts receivable, and I asked him if he understood what an account receivable was, and he stated, "when somebody owes you money." In this particular situation he disclosed that Michael Wilson owes him $7 million.

Q   And were any follow-up questions put to Mr. Montgomery about the nature of this $7 million account receivable?

A   Mr. Montgomery advised us this was a verbal agreement he had with Michael Wilson as part of an ongoing agreement that he was in conversations and negotiations he had with Michael Wilson involving EVSI, which was Electronic Valet Systems, I believe, Incorporated.

Q   Well, what did you ask him about the nature of this $7 million?

A   Well, as accounts receivable are generally a legal debt, that somebody owes you and particularly in general accounting terms and for people who review financial statements, accounts receivable are collectibles. They're pretty fluid or pretty liquid. As a matter of fact it's not unusual for businesses to pledge their accounts receivable to a bank in order to obtain a loan because a bank then just collects the payments on the accounts receivable.

In this case, there's no written document. It was just a verbal agreement he and Michael Wilson had, that Michael Wilson would give him $7 million based on this contract that Mr. Montgomery

had with the government of Mexico.

Q   Is that what Mr. Montgomery told you in the interview?

A   Yes.

Q   Did you ask, or was Mr. Montgomery asked directly whether or not he had a written contract with Michael Wilson on the EVSI, or Electronic Valet deal?

A   He was specifically asked. He said he didn't have a written contract, but he intended to get one put together, a written contract or agreement, but he intended to get one put together.

Q   Now was Mr. Montgomery asked about a listing on here for Bank of Saipan's stock under other assets. You see that --

A   Yes, he was.

Q   -- moving down?

A   Item No. 5.

        MR. SMITH: If you could blow that up, please.

Q   And how much is he saying that's worth on his financial statement?

A   He says it's worth $3,099,996.

Q   Now was Mr. Montgomery asked about that on his financial statement in connection with funds received from United Forex Exchange?

A   Yes. If you'll remember, Mr. Montgomery told us he had

borrowed 2.8 million to buy the shares of stock at Bank of Saipan, and that he now owed, and that the share were used to collateralize the loan from United Forex. Well, if you look on here, there's no entry to indicate that of this $3,099,996.00, 2.8 million of it is actually belonging or had been pledged to United Forex. When you present your card, you tell somebody, "I have a $20,000 car but you owe $19,000 on it, you really can't tell them that it's -- might be worth $20,000, but if they were to pay you $20,000, you don't get $1,000 in your pocket after you paid off the Bank.

    MR. SMITH: Well, let's shrink this down.

Q    And on Mr Montgomery's assets, is there a listing for a 2.8 million -- withdrawn. On Mr. Montgomery's liabilities, is there a listing for a $2.8 million debt to United Forex Exchange, looking at the document?

A    Right, I am. There is, there's no, there's nothing on here that indicates that there's $2.8 million offset against that three, what appears to be a $3 million value of that stock. Another way to have shown it would have been to have the value of it reduced by the amount of the outstanding debt. And in other words, and as we asked Mr. Montgomery, it's misleading. It makes you believe that he's got $3 million in Bank of Saipan's stock when in fact he doesn't, you know. At this point in time, he might have about $300,000 in equity

1   in the Bank of Saipan's stock.

2   Q    Let me just stop you there. Was Mr. Montgomery asked directly
3   about why it was that the $2.8 million was nowhere to be found, $2.8
4   million debt to United Forex was nowhere to be found in his
5   financial statement?
6   A    Yes, he was.
7   Q    And what did he say?
8   A    He just said that he didn't --
9
10              MR. PARSONS: Object.
11              THE COURT: Excuse me. There's an objection.
12              MR. PARSONS: I'm sorry. Leading, sir. Calls for --
13              THE COURT: Sustained.
14              MR. PARSONS: -- a "yes" or "no." Yes.
15              THE COURT: Sustained.
16
17  Q    BY MR. SMITH: Agent, Hewitt, tell us what Mr. Montgomery was
18  asked about the absence of the United Forex Exchange $2.8 liability,
19  if anything at all was asked about that subject.
20  A    Mr. Montgomery was asked if the $2.8 million debt to Bank of
21  Saipan was disclosed within his financial statement and he said,
22  "No."
23
24  Q    To Bank of Saipan or United Forex Exchange?
25  A    Oh, I'm sorry. Excuse me. That United Forex Exchange debt as

it relates to the Bank of Saipan's stock.

Q    What, if anything, did he say about the importance of the absence of that disclosure?

A    Again, in the course of the questioning, we asked him, does he understand that, that's, you know, the significance of it, and he said that, "Yes, it's not on there and it does mislead people into believing that he has a $3 million equity in the Bank of Saipan's stocks.

Q    What, if anything, was Mr. Montgomery asked about this EVSI contract that he's carrying and other assets as being worth approximately $24,200,000?

A    The EVSI contract with Mexico involved a negotiation that Mr. Montgomery had entered into with the Mexican Government to replace paper food stamp coupons with an electronic ATM card, a debit card, which would help to reduce the amount of fraud within the Mexican Government and the use of food stamps within the Mexican Government, and that he had signed a contract with an individual that would give EVSI a chance of being the person or the entity that would implement that program.

Q    And what, if anything, was Mr. Montgomery asked about the status of this contract with the Mexican Government and EVSI?

A    Being familiar with contracts with governments, I asked him

1597

what government entity has agreed to implement that? Is that something the Mexican Government has agreed that they would implement? And he indicated, "No, it hasn't been; it's not been officially accepted by the Mexican Government." What it is is it's a contract with an individual that they would go in and be the ones who'd run that program.

Q    Was Mr. Montgomery -- see the item that says, "Four times projected earnings"?

A    Uh-huh.

Q    Was Mr. Montgomery asked whether or not there were any actual earnings?

A    He was asked and, no, there are no earnings of EVSI on the contract with Mexico. That is projected earnings based on some computations he did of what he estimated what would happen under this contract.

Q    About how long did the interview with Mr. Montgomery last on March 8, 2002?

A    A little over two hours, about two hours and ten minutes or so.

Q    And in court today, have you related all of the statements that Mr. Montgomery made or have you just answered the questions put to you?

A    No, I've just answered the questions that were put to me.

4730

THE COURT: And the record as well will reflect that the defendants, the three defendants are also present this afternoon. Will the foreman, please rise at this time? Has jury reached a verdict, Mr. Foreman?

THE FOREPERSON: Yes, we did.

THE COURT: Okay, is the verdict signed and dated?

THE FOREPERSON: Yes, it is.

THE COURT: Present the verdict form to the bailiff, please. Thank you, Madam Clerk.

Will the defendants, please, rise?

At this time I would ask the Madam Clerk to publish the verdict.

THE CLERK: Ladies and gentlemen of the jury, please listen to your verdict as it will be read and recorded. In the United States District, Northern Mariana Islands in Criminal Case 02-00010, *United States of America, plaintiff vs. Bert Douglas Montgomery, DuSean Berkich, and Tomas B. Aldan.*

As to defendant Bert Douglas Montgomery. Verdict. We, the jury, render the following unanimous verdict as to the defendant Bert Douglas Montgomery in this cause. As to Count 1, Conspiracy to Commit Wire Fraud: Guilty. As to Count 2, Wire Fraud on or about November 8, 2001: Guilty. As to Count 3, Wire Fraud on or about

4731

December 20, 2001: Not guilty. As to Count 4, Wire Fraud on or about January 8, 2002: Guilty. As to Count 5, Wire Fraud, Deprivation of Honest Services on or about January 11, 2002: Guilty. As to Count 6, Money Laundering Conspiracy: Guilty. As to Count 7, Money Laundering on or about November 28, 2001: Guilty. As to Count 8, Money Laundering on or about December 4, 2001: Guilty. As to Count 9, Money Laundering on or about December 10, 2001: Guilty. Signed by the jury foreperson, dated June 18, 2003. Certification: "I, as a foreperson, certify that the above decision represents the unanimous verdict of each and every juror in this cause." Signed again by the foreperson and dated June 18, 2003.

"Verdict form in the same case, defendant DuSean Berkich. Verdict. We, the jury, render in the following unanimous verdict as to defendant DuSean Berkich in this cause. As to Count 1, Conspiracy to Commit Wire Fraud: Guilty. As to Count 2, Wire Fraud on or about November 8, 2001: Guilty. As to Count 3, Wire Fraud on or about December 20, 2001: Not guilty. As to Count 4, Wire Fraud on or about January 8, 2002: Guilty. As to Count 6, Money Laundering Conspiracy: Guilty. As to Count 7, Money Laundering on or about November 28, 2001: Guilty. As to Count 8, Money Laundering on or about December 4, 2001: Guilty. As to Count 9, Money Laundering on or about December 10, 2001: Guilty. Signed by the

283

Sep-06-2005 10:13 From-US DISTRICT CRT, NMI  +16702362910  T-183 P.001/002 F-841

FILED
Clerk
District Court

AUG 2 9 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

FAX IN
09/06/05

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal No. 02-00010 |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | ORDER AFTER |
| ) | LIMITED REMAND |
| BERT DOUGLAS MONTGOMERY, ) | DENYING RESENTENCING |
| ) | |
| Defendant ) | |

THIS MATTER is before the court on limited remand from the U.S. Court of Appeals for the Ninth Circuit, for the court to determine "whether the sentence imposed would have been materially different had the [ ] court known that the sentencing guidelines were advisory." United States v. Ameline, 409 F.3d 1073, 1074 (9th Cir. 2005) (en banc). The mandate issued August 18, 2005.

THE COURT has reviewed the court file, the presentence report, and the sentence imposed upon defendant, and also has an independent recollection of the

salient facts of this jury trial. The court would not have imposed a materially different sentence had it known the sentencing guidelines were advisory, and it declines to resentence defendant Montgomery for the following reasons.

This defendant's primary role in the intentional fraud perpetrated on the Bank of Saipan resulted in direct injury to thousands of bank depositors, including the Commonwealth government, all of whom lost access to their savings. The indirect injury caused to the families of individual account holders and to the creditors of business account holders was significant and still reverberates in the community as the Bank has continued in receivership since May of 2002. The cold, calculating nature of the crime and the financial losses and inconvenience caused to so many victims warranted the sentence imposed.

Should defendant wish to appeal this order, he "may file a notice of appeal as provided in Fed.R.App. 4(b)." <u>United States v. Ameline</u>, 409 F.3d at 1085.

DATED this 29th day of August, 2005.

_____
ALEX R. MUNSON
Judge

grounds offered by the defense to do so.  *Koon* states that you look to see whether the particular factor is within the heartland given all the facts of the case.

Your Honor, Mr. Montgomery is 65 years old.  If this court sentences him to 20 years --

THE COURT: I think you already made this argument.  In fact you made a recommendation for 10 years.  Am I correct?

MR. BERLINE: I did, Your Honor.

THE COURT: Okay.

MR. BERLINE: But given the fact that we didn't get our adjustments, I'd like to revise that.

THE COURT: All right, you can be heard.

MR. BERLINE: Thank you.  That if this court sentences him to 20 years, that he will die in prison, Your Honor.

THE COURT: Well, that's your characterization.

MR. BERLINE: He has, although he seems to be in good health now, he does have diabetes.  He does have hernia.  And there is provisions in the Sentencing Guidelines that, although disfavored, allow the court to deviate based on age along with infirmity.

Moreover, Your Honor, Mr. Montgomery did not personally benefit.  The money went to Mr. Wilson.  Mr. Wilson paid off his

1  debt and has been sentenced to three years.  Mr. Montgomery, without
2  benefiting or profiting in any way, --
3      THE COURT: Mr. Wilson hasn't --
4      MR. BERLINE: I'm sorry.  Mr. Montgomery, without
5  benefiting --
6      THE COURT: No, but Mr. Wilson hadn't paid off his debt.
7      MR. BERLINE: The $5 million went to many of his personal
8  debts, Your Honor.
9      
10     THE COURT: Oh, his -- I'm sorry.  I thought you meant his
11 debt to the Bank that --
12     MR. BERLINE: Oh, no, Your Honor.
13     THE COURT: The ordered restitution.  All right.
14     
15     MR. BERLINE: Mr. Montgomery is looking at 20 years, and he
16 never profited from any of this.  And that's where it just doesn't
17 make sense, Your Honor.  And that's where the combination between
18 him not personally benefiting from these crimes and his age of 65
19 years add the disparity between the sentences, I think gives ground
20 for this court to grant some leeway here.
21     
22     Your Honor, if this court sentences Mr. Montgomery to 12
23 years, he will be out when he is 77 years old.  He will not be a
24 danger to the community at that time.  He will have paid a fair and
25 reasonable price for these actions, Your Honor.  We ask that this

policy statement. There's just no evidence to support this, this application. So the court should deny it and impose a sentence within the guideline range as found by they court.

THE COURT: Thank you. Before the court rules on -- I'm sorry.

MR. BERLINE: Your Honor, real brief. What we, what our point is, is that Mr. Montgomery -- I don't think that the sentencing guideline is, talks about putting someone who, a reasonable, normal everyday fraud defendant, money laundering defendant, gets sentenced to 20 years in jail. The everyday participants, probably 30, 40, 50 years old. I don't think the sentencing guideline talks about somebody who is, will die in prison as a result of a white-collar crime, Your Honor. And that's our point. We understand that the sentencing guideline allows for age plus infirmity, although it's disfavored. But our point is it doesn't talk about when, a point when a defendant has been convicted of a nonviolent crime that does not involve drugs, bodily harm, anything like that, and ends up spending the rest of his living days in prison, Your Honor. That's our basis. Thank you.

THE COURT: Thank you. Before the court rules on the motion for downward departure, I want to give Mr. Montgomery an opportunity to make his allocution or tell me anything that he

the mistakes that we made.

Now I am 65 years old. I've never been in trouble. It's hard to face the fact that you're failing your family. I believe that's why Mr. DuSean took his life. He'd called and he told me that he was going to. That's why I took him to movies. I would like an opportunity to get out of the jail and possibly give something back to society. I'm getting up in age. If you feel it in your heart to give me that, I would certainly appreciate it, and I will do whatever I need to do to try to pay back and give something back to society in the few years that I have. That's all I have to say. Thank you.

THE COURT: At this point because of the time, we will take a recess and we will reconvene -- what is our schedule?

THE DEPUTY CLERK: We have a 3:00 o'clock and a 3:30, Your Honor.

THE COURT: The 3:00 o'clock is the arraignment?

THE DEPUTY CLERK: Yes, Your Honor.

THE COURT: The 3:30 is what?

THE DEPUTY CLERK: Sentencing that we postponed this morning.

THE COURT: We'll reconvene at 4:00 o'clock in this courtroom and the court will impose sentence at that time. Being